[Civ. No. 25648. Fourth Dist., Div. Two. Aug. 28, 1981.]

MISSION INSURANCE COMPANY, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and
FREDERICK BLANKENHORN, Respondents.

COUNSEL

Brian A. Hill and Towner, Kristjanson, Bellanca & Hill for Petitioner.

A. J. Ufkes and Ufkes & Bright for Respondents.

OPINION

KAUFMAN, Acting P. J.—On October 15, 1979, Frederick Blankenhorn (applicant) sustained an injury to his right elbow, right hip and pelvis while working. He filed an application for adjudication of claim against Morse Signal Devices (Morse) and Mission Insurance Company, its workers' compensation insurer, seeking workers' compensation benefits on account of his injury. The defendants answered denying employment and setting up an affirmative defense that applicant was an independent contractor, not an employee at the time of his injury.

The WCAB judge who presided at the trial credited the testimony of defendants' witnesses to the extent there was any conflict in the evidence and concluded that the applicant was an independent contractor, not an employee of Morse. The Workers' Compensation Appeals Board (Board) granted reconsideration and determined on the same evidence that applicant was an employee, not an independent contractor. On review defendants contend the Board's decision is not supported by substantial evidence on the whole record and the Board arbitrarily and unreasonably drew inferences from isolated bits of evidence insubstantial when the whole record is considered and, indeed, misstated significant portions of the evidence. We agree, and the opinion and decision of the Board will be annulled.

Morse is in the business of installing and servicing security alarms. It maintains a service department in which it employs some 50 employees. However, it maintains no facilities in Orange County and, because the distances involved did not in its view justify the use of its regular service department, it serviced its Orange County accounts, first through a firm known as Warner Alarms and subsequently through applicant, doing business as Electronic Detection Company, pursuant to written agreements purporting to create the relationship of principal and independent contractor.

Initially, in June 1973, applicant was hired as a regular employee of Morse, and he worked out of Morse's Hollywood office as one of about 50 security alarm agents. While thus employed applicant, like all other regular employees worked an eight-hour day, was paid on an hourly basis, was provided a vacation and medical benefits, had deductions taken from his pay for state and federal taxes, operated a Morse vehicle when making service calls and was required to keep a detailed log of "call"

and "truck" reports consisting of records of all activities performed and the time required for each.

In about March 1975, applicant moved his residence to the Orange County area, and when he learned that the arrangement between Morse and Warner Alarms for servicing the Orange County accounts was to be discontinued, he asked whether he might service the Orange County territory. Morse was agreeable and in March 1975 Morse and applicant, dba Electronic Detection Company, entered into a written contract entitled "SUBCONTRACT AGREEMENT" which, in five typewritten pages and three 1-page appendices, set forth in some detail the arrangements between the parties. The agreement recites that Morse is in the business of installing and maintaining electrical protection systems and maintains various accounts in Orange County and that applicant doing business as Electronic Detection Company, designated "Subcontractor," is in "the business of servicing and installing electrical protection systems in the County of Orange . . . and . . . desires to service and install Morse accounts as an independent contractor. . . ." It provides that "Subcontractor will maintain a location to accept all calls from Morse or Morse subscribers. . . . Upon receipt of a call from Morse or a Morse subscriber, Subcontractor shall dispatch *either himself or one or more of his service trained employees* to the subscriber premises and shall ascertain the nature of the trouble or difficulty. On ascertaining the trouble, Subcontractor shall take all steps necessary to restore the system to proper working order as soon as possible in a diligent and workmanlike manner." (Italics added.) It also provides: "Morse shall determine the standards of quality for service and installation and Subcontractor shall install and service by these standards." Pursuant to the agreement Electronic Detection Company was to receive a base rate of $100 per month, $5 per month for each local alarm system in the service area and $10 per month for each central office alarm system in the service area whether or not service was required, and certain specified fees for inspecting fire alarms and connecting certain devices. "Miscellaneous installation" services were to be performed at $9 per hour.

Article 5 of the agreement is entitled "INDEPENDENT CONTRACTOR." It provides: "It is hereby declared to be the express intention of each of the parties that the relationship created hereto between Morse and Subcontractor by this contract is that of an independent contractor[,] and Subcontractor, his employees, or agents shall not be deemed to be the employee or agent of Morse. Subcontractor shall have the sole right to

hire and fire all of his employees or agents and shall exercise all control, direction and supervision over them with respect to the work to be performed and the manner in which the work is to be performed, and Morse shall not have any right to exercise any control, direction or supervision over the said employees or agents of Subcontractor, subject to the limitations set forth herein."

Article 6 is entitled "INSURANCE." It provides: "It is understood and agreed that Subcontractor shall provide Workmen's Compensation Insurance for his employees and agents and shall hold Morse harmless and indemnify Morse for and against any loss, cost or expense including, but not limited to court costs or attorneys' fees arising out of or with respect to any injury, death or disability of any of his employees or agents. Subcontractor further agrees to secure and maintain during all times when he is engaged in work under this contract, public liability and property damage insurance with a minimum limit of $100,000-$300,000 for the death of or injury to any one person or injury or death to persons in any one accident and for damage to or destruction of property and to furnish to Morse either a duplicate of the policy evidencing such insurance or certificate of the insurance carrier to the effect that the insurance is in force. Subcontractor agrees to hold Morse harmless and indemnify Morse from and against any and all loss, cost, expense, damage, suits, causes of action, attorney fees and any and all other costs or expenses arising out of the performance of Subcontractor, his agents or employees."

Article 7 is entitled "WITHHOLDING." It provides: "Subcontractor agrees that he shall make and shall be responsible for all deductions from payments to his employees or agents and shall make and render, in his own name, all reports and payments of such sums so deducted as shall be required by any and all federal and state ... laws ...."

Article 8 is entitled "TERMINATION." It provides: "This agreement may be terminated by Morse upon the giving of 30 day's written notice to Subcontractor. This 30-day requirement is waived if in the opinion of Morse the Subcontractor's conduct justifies immediate termination. This agreement may be terminated by the Subcontractor upon the giving of sixty (60) day's notice by Subcontractor to Morse. In the event of termination, Subcontractor agrees that he shall not call on any Morse accounts and shall in no way represent that he is in any way associated with Morse nor shall Subcontractor use the name of Morse or any name which may be associated with or confused with Morse or any

of the Morse related companies. [¶] Upon termination, Subcontractor will return to Morse all equipment, radio equipment, tools, supplies, records, papers and all other property of Morse's."

Upon taking over the Orange County territory, applicant registered the fictitious business name Electronic Detection Company and operated his business under that name. Prior to the time of his injury he obtained from the State of California a license required of persons engaged in the business of installing and servicing burglary alarms. His licensed status ("Calif. St. Lic. # 295407") was expressly set forth on the stationery he had prepared under the letterhead "Electronic Detection Co." at 9511 Warburton Drive, Huntington Beach, California 92646, telephone (714) 962-4894. He obtained the public liability insurance coverage required by the subcontract agreement and furnished Morse evidence thereof. He filed income tax returns stating he was "self-employed," and no deductions were made by Morse for taxes, social security or other such items from payments made by Morse pursuant to the subcontract agreement. Applicant submitted monthly billings to Morse on the Electronic Detection Company stationery, and all payments were made by Morse by check payable to Electronic Detection Company. At the instance of applicant certain of the specified fees were renegotiated and increased on August 2, 1977, evidenced by handwritten changes on appendix B to the agreement.

Whereas as a regular employee applicant worked a normal eight-hour shift out of Morse's Hollywood facilities, he now operated out of his own residence and did not work any specific hours, although he was on call twenty-four hours per day and carried a pager. He used his own vehicle and paid all his own vehicular expenses. He worked alone without supervision and his work was inspected only in the event of a specific customer complaint (see discussion, *infra*). Occasionally he attended lectures or instructional classes at Morse's premises concerning the proper method of installing and servicing alarm devices. However, after taking over the Orange County territory, he no longer was required to keep a detailed log of "call" and "truck" reports and any records that he made were solely for his own billing purposes. In the event that he wanted to take time off from work, he hired, paid and supervised his own replacement. He employed such replacement personnel both before and after his injury. Applicant's replacement personnel were neither supervised nor paid by Morse.

Because applicant was required to respond to alarms, to facilitate his identification by Morse's customers and his entry into the premises of Morse's customers, applicant wore a shirt that contained a distinctive Morse insignia. Although applicant knew that his doing so displeased Morse, he carried a firearm while working.

■■■ The law applicable in determining whether an injured person was an employee or an independent contractor, while not unusually easy to apply, is well established. (All statutory references will be to the Labor Code unless otherwise specified.) Section 3351 defines "employee" as meaning "every person in the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully employed, ..."

Section 3353 defines "independent contractor" as meaning "any person who renders service for a specified recompense for a specified result, under the control of his principal as to the result of his work only and not as to the means by which such result is accomplished."

Section 2750.5 enacted in 1978 (Stats. 1978, ch. 1246, § 1, pp. 4057-4058, as amended) the text of which is set forth in the margin,[1] gives guidance in making the sometimes difficult determination. It creates a rebuttable presumption affecting the burden of proof that a worker performing services for which a contractor's license is required, or who is performing such services for a person who is required to be licensed, is an employee rather than an independent contractor. It then sets forth a number of factors as to which satisfactory proof ought to be made to establish that the injured person was an independent contractor. They are (1) that the injured person had discretion as to and the right to control the manner of performance and that the result of the work and not the means by which it is accomplished was the primary factor bargained for; (2) that the injured person "is customarily engaged in an independently established business"; (3) that the injured person's independent contractor status was bona fide and not a subterfuge to avoid employee status; and (4) that if the injured person was performing work for which a contractor's license is required, the injured person should have held such a license.

---

[1] Labor Code section 2750.5 reads: "There is a rebuttable presumption affecting the burden of proof that a worker performing services for which a license is required pursuant to Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, or who is performing such services for a person who is required to obtain such a license is an employee rather than an independent contractor. Proof of in-

In respect to the third factor (not a subterfuge), a number of subfactors are mentioned as significant: substantial investment other than personal services in the business of the injured person; the injured person's holding himself or herself out to be in business for himself or herself; bargaining for a contract to complete a specific project to be compensated by project rather than by time; who has control over the time and place the work is performed; who supplies the tools or instrumentalities used in the work; whether the injured person hired employees; whether the work performed was or was not ordinarily in the course of the principal's work; whether the work performed required a particular skill; the injured person's holding a license pursuant to the Business and Professions Code; the intent of the parties that the work relationship be that of an independent contractor; whether or not the relationship is severable or terminable at will by the principal.

A number of well regarded appellate decisions discuss and apply many of these same factors in determining whether a relationship was that of employer-employee or independent contractor. In *Empire Star Mines Co.* v. *Cal. Emp. Com.* (1946) 28 Cal.2d 33, 43 [168 P.2d 686], the court stated: "In determining whether one who performs services

---

dependent contractor status includes satisfactory proof of these factors:

"(a) That the individual has the right to control and discretion as to the manner of performance of the contract for services in that the result of the work and not the means by which it is accomplished is the primary factor bargained for.

"(b) That the individual is customarily engaged in an independently established business.

"(c) That the individual's independent contractor status is bona fide and not a subterfuge to avoid employee status. A bona fide independent contractor status is further evidenced by the presence of cumulative factors such as substantial investment other than personal services in the business, holding out to be in business for oneself, bargaining for a contract to complete a specific project for compensation by project rather than by time, control over the time and place the work is performed, supplying the tools or instrumentalities used in the work other than tools and instrumentalities normally and customarily provided by employees, hiring employees, performing work that is not ordinarily in the course of the principal's work, performing work that requires a particular skill, holding a license pursuant to the Business and Professions Code, the intent by the parties that the work relationship is of an independent contractor status, or that the relationship is not severable or terminable at will by the principal but gives rise to an action for breach of contract.

"In addition to the factors contained in subdivisions (a), (b), and (c), any person performing any function or activity for which a license is required pursuant to Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code shall hold a valid contractors' license as a condition of having independent contractor status.

"For purposes of workers' compensation law, this presumption is a supplement to the existing statutory definitions of employee and independent contractor, and is not intended to lessen the coverage of employees under Division 4 and Division 5."

for another is an employee or an independent contractor, the most important factor is the right to control the manner and means of accomplishing the result desired. If the employer has the authority to exercise complete control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists. Strong evidence in support of an employment relationship is the right to discharge at will, without cause. [Citations.] Other factors to be taken into consideration are (a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." (Accord: *Tieberg* v. *Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 949-953 [88 Cal.Rptr. 175, 471 P.2d 975]; Rest.2d Agency, §§ 2, 220.)

■ The question of whether an injured person was an employee or an independent contractor is generally referred to as a question of mixed law and fact. Where two reasonable inferences may be drawn from the evidence, the inference accepted by the Board must be sustained; however, when only one inference can reasonably be drawn from the evidence, the determination becomes a question of law. (See *Schaller* v. *Industrial Acc. Com.* (1938) 11 Cal.2d 46, 51 [77 P.2d 836]; *Durae* v. *Industrial Acc. Com.* (1962) 206 Cal.App.2d 691, 698 [23 Cal.Rptr. 902].) ■ We believe that in reality only one reasonable inference can be drawn from the evidence in the case at bench and that therefore the applicant was an independent contractor at the time he was injured as a matter of law. However, the result is the same if the problem is treated as one of substantial evidence on the whole record.

In *LeVesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 638-639 [83 Cal.Rptr. 208, 463 P.2d 432], the California Supreme Court explicated the difference between the "any substantial evidence" rule and the "substantial evidence on the entire record" rule. Said the court in footnote 22: "The reviewing court must consider the entire record (Lab. Code, § 5952) and may not isolate only the evidence which supports the board's findings [citation] and thus disregard relevant evi-

dence in the record. [Citation.]" In *Garza* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 312, 317 [90 Cal.Rptr. 355, 475 P.2d 451], the court further elaborated: "In *LeVesque, supra*, this court rejected prior decisions which suggested that the board's decision would be sustained if supported by any evidence whatsoever, and we determined that the test of substantiality must be measured on the basis of the entire record, rather than by simply isolating evidence which supports the board and ignoring other relevant facts of record which rebut or explain that evidence." (Accord: *Lamb* v. *Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 274, 280-281 [113 Cal.Rptr. 162, 520 P.2d 978]; *Hurwitz* v. *Workers' Comp. Appeals Bd.* (1979) 97 Cal.App.3d 854, 861, fn. 3 [158 Cal.Rptr. 914].)

In its opinion and decision in the case at bench the Board did exactly what was proscribed in *LeVesque, Garza* and *Lamb*. It selected isolated bits of evidence to support its conclusions, ignoring the massive and overwhelming evidence to the contrary and incorrectly stating or characterizing the evidence relating to several important points. Moreover, on the basis of the isolated bits of evidence it chose to refer to, it overturned the findings and conclusions of the trial judge based as to at least one vital point on credibility assessments and supported by overwhelming evidence.

Citing *Empire Star Mines* and *Tieberg*, the Board pointed out that the right of an alleged employer to control the manner and means of accomplishing the result desired is the most important factor to be considered in determining whether a relationship is to be characterized as employer-employee or independent contractor. It then discussed the right of Morse to terminate the subcontract agreement as giving Morse "a significant right . . . to control the conduct of the applicant." It went on: "Most significant, however, is the way the parties acted toward one another. The applicant testified to the effect that he was supervised by a representative of Morse, was audited or inspected from time to time, was required to wear the Morse uniform and to be continuously on call to perform emergency services, received his assignments each morning from Morse, was summoned to Morse facilities from time to time for training or reprimands and used tools and parts belonging to Morse. The applicant also testified to the effect that he was paid a commission on each device maintained in his territory and on an hourly basis for installation work. [¶] The testimony of two representatives of Morse does not substantially conflict with the applicant's testimony." The Board then concluded that the evidence preponderated in favor of the conclu-

sion that Morse had the right to exert, and did exert "sufficient control over the means by which the applicant performed the installation and servicing of the alarm systems as to render the applicant an employee of Morse."

The significance of the various factors varies depending upon the circumstances of the case. (See *Tieberg* v. *Unemployment Ins. App. Bd., supra*, 2 Cal.3d at pp. 953-954 [text following headnotes (7), (8), and (9)].) Of the considerations mentioned by the Board, the facts that applicant wore the distinctive Morse insignia, was on call 24 hours a day, carried a pager, received assignments each morning from Morse headquarters, went to Morse facilities on occasion for training and used tools owned by Morse are of little value in ascertaining the relationship. Moreover, they are all but irrelevant to the right to control the means by which the result, service of Morse's Orange County customers, was to be achieved. All were required by the nature of the business or the fact that the services to be rendered by applicant were ongoing, not a one-time proposition. Applicant had to call in in the morning to find out which customers required service; the pager, the use of which applicant paid for, was required so that he could be informed of the need for emergency service; he wore the distinctive insignia for his own safety and immediate recognition when responding to alarms; he attended classes in the proper methods of installation and servicing so he would have the requisite knowledge to perform the services without supervision or to instruct and supervise his employees; the tools were furnished him by Morse as an accommodation; certainly he could expect to hear about it if a particular job he had done was not up to Morse's standards.

All these things would be virtually the same whether applicant were an employee or an independent contractor. The Board's enumeration of these facts in connection with its conclusion that Morse had the right to exercise control suggests that the Board may have had a mistaken concept of the type of control that has significance in a situation such as this. It concluded that Morse had the power to affect the applicant's conduct. Of course it did. But the fact that Morse prescribed standards of performance and that the applicant on occasion attended lectures or classes concerning proper methods of installation and service was not evidence that Morse controlled *the manner in which the desired result was to be achieved*. "The test of 'control,' however, means '*complete* control.' For example, the citizen who hires a taxicab to take him to a certain place exercises that amount of control over the driver, but he

does not thereby become the man's employer." (*Western Indemnity Co. v. Pillsbury* (1916) 172 Cal. 807, 811 [159 P. 721] (italics in original.); see also *Moody* v. *Industrial Acc. Com.* (1928) 204 Cal. 668, 671 [269 P. 542, 60 A.L.R. 299]; *Tieberg* v. *Unemployment Ins. App. Bd., supra,* 2 Cal.3d at p. 949.) If there were any question about the matter it would be resolved by the uncontradicted testimony that the applicant was not required to do the work himself, that he had the right to have the work done by his employees, that, in fact, he did so on several occasions, both before and after his injury and that he, not Morse, instructed and supervised the work of the persons he employed.

As to the other factors mentioned by the Board in connection with its conclusion about Morse's right to control, the fact that he was paid an hourly rate for miscellaneous installation is essentially irrelevant to the issue of control since the applicant kept his own time. The fact that he was paid a commission for each device in his territory whether or not it required service is irrelevant to control, but it points strongly toward independent contractor status. None of Morse's regular servicemen receive any such commission; they are all paid by the hour.

What is left is the Board's advertence to Morse's right to terminate applicant and its reliance on snippets of applicant's testimony that, in the words of the Board, he was "supervised by a representative of Morse, [and] was audited or inspected from time to time."

A right to terminate the agreement at will and without cause does, of course, carry with it a certain amount of power to control conduct. In the case at bench, however, the power to terminate without notice was not really unconditional; the agreement imposed upon Morse a duty to exercise that power only upon a good faith belief that its interests required such action, based on applicant's conduct. In any event, there was no substantial evidence that Morse in fact exercised or threatened to exercise its termination power to control the means or manner by which the desired result was to be achieved. In fact, just the opposite is true. After applicant was injured and disabled from performing the required services himself, he employed another person to do the work whom he instructed and supervised, and Morse continued to fulfill its part of the agreement.

Applicant's testimony as a whole does not constitute substantial evidence that Morse had the right to or did exercise control over the manner in which he performed his services. It is true that in answer to

several leading questions the applicant stated that he was "audited" (whatever that means) by one or more of his supervisors, whose name or names he could not recall and that in answer to a question whether he was ever told how to do a particular job, he responded "Yes." But it is clear from his testimony considered as a whole that he worked alone, without direct supervision and did particular jobs in the order and at the time of his choosing, except perhaps for emergency service. On the other hand, both the subcontract agreement and the testimony of two witnesses called by Morse were to the effect that within the standards prescribed by the company, the applicant had complete discretion and control over the manner in which he performed his work, that he worked alone without supervision, that his work was not inspected except where a customer made a specific complaint, and that the time at which and the order in which he visited various customers was within his own control and discretion.

Thus, contrary to the Board's statement, the fragments of the applicant's testimony relied on by the Board were directly contradicted by the testimony of Morse's managerial employees. And the judge who presided at the hearings credited the testimony of Morse's witnesses. In his report on applicant's petition for reconsideration he stated specifically, "the applicant had complete control over the details of the work he performed. [¶] . . . For a more detailed discussion, the Board is referred to the defendant's Answer to Petition for Reconsideration, a remarkably able and accurate review of the facts in this case. The undersigned adopts and incorporates that Answer."

On the evidence, the conclusion reached by the trial judge that the applicant had control over the manner in which the desired result was to be achieved was and is inescapable. Once again, if there were any question about the matter, it would be answered conclusively by the fact that the contract did not even require that the services be performed by applicant personally. He could and did on several occasions have employees of his own perform the work, and he, not Morse, supervised those employees.

The other major finding of the Board was that the subcontract agreement was a subterfuge by Morse to avoid the employer-employee relationship. There is no legitimate legal basis for that conclusion. Board relied on: (1) the fact that the agreement precludes applicant from doing work for any other electronics company; (2) the fact that the agreement requires applicant to install and service the alarm sys-

tems in accordance with standards of quality established by Morse; and (3) the fact that under the agreement Morse had the right to terminate the applicant immediately if it believed his conduct justified immediate termination, while applicant was required to give 60 days notice of termination.

As previously observed, to terminate applicant immediately would have required Morse to entertain a good faith belief that applicant's *conduct* warranted immediate termination. Thus Morse's right to immediate termination was restricted; to exercise its right it would have to have cause of a sort, based on applicant's conduct.

We reject the Board's conclusion that Morse's establishing quality standards for the completed work is indicative of an employer-employee relationship or constitutes evidence of subterfuge. On the contrary, an employer who controls the manner in which the work is done has little need of establishing quality standards for completed work; such standards are indicative that Morse's primary interest was in the quality of the result rather than the manner in which the work was done and constitutes evidence that applicant was an independent contractor.

In view of the ongoing nature of the relationship, we see little significance in the fact that the applicant was not to perform services for other burglar alarm companies. Far more significant is the fact that the applicant was not prohibited from engaging in any other kind of business or commercial activity; his personal services were not required and he could have the services performed by persons selected, employed, trained and supervised by him if he chose to do so. And on occasions both before and after his injury he did.

Three other highly significant factors mentioned in subdivision (c) of section 2750.5 (see fn. 1, *ante*) establish well nigh conclusively that there was no subterfuge. First, the applicant either was or held himself out as being in business for himself. He registered his fictitious name, had letterheads printed, billed in that name, received payment in that name, hired employees occasionally, and stated on his tax returns that he was self-employed.

Secondly, he obtained a license from the State of California to install and service alarm systems. In its opinion and decision the Board stated that the evidence as to whether or not the applicant obtained a state license was unclear. To the contrary, it was perfectly clear. The Board

indicated that the testimony of one of Morse's witnesses about a conversation with the applicant concerning his having obtained a license was indefinite as to time. However, the applicant's letterhead on which he sent Morse his bill for July 1979, *several months before his injury*, specifically shows that Electronic Detection Company held California State License No. 295407 at that time.

Finally, the intent of the parties that the relationship be that of principal and independent contractor was expressly set forth in the subcontract agreement and is substantiated by the circumstances. Morse had approximately 50 service employees all of whom worked regular 8-hour days and were paid by the hour and were admittedly covered by the workers' compensation law. The applicant himself was originally one of that group of employees. It was at the applicant's specific request, made for purposes of his own, that he was given the Orange County territory and the relationship was changed. Morse had no facilities in the Orange County area and had good business reasons based on the distances involved for not wanting to service the Orange County accounts through its regular staff. The applicant was not the first to service the Orange County territory on an independent contractor basis; a similar arrangement had been worked out by Morse earlier with Warner Alarms. This was not a new arrangement dreamed up to deprive applicant of his employee status. Nor was it a scheme devised so that Morse would not have any employees.

It is mentioned that applicant was not represented by an attorney at the time the subcontractor agreement was entered into and the applicant testified that he did not "particularly" read the agreement before signing it. However, it is not claimed that the contract was oppressive or unfair. The provisions relating to the nature of the relationship established were set forth under headings in capital letters and were clear and prominent. It is inconceivable that the applicant labored under any great misapprehension as to his status in view of the uncontradicted evidence that in connection with the contract he established a fictitious business name, obtained a state license, took out liability insurance, hired persons to do the actual work on several occasions, billed Morse in his business name and on his business stationery, received payment in his business name without deductions for withholding or other employee taxes, and negotiated advantageous changes in the compensation to be paid him under the agreement.

When, as here, the parties have entered into a written agreement setting forth the details of their relationship and, indeed, expressly stating the legal relationship they intended to create, such agreement is a significant factor for consideration. (*Tieberg* v. *Unemployment Ins. App. Bd., supra,* 2 Cal.3d at pp. 951-952.) The conduct of business and commerce requires that persons be able to act on their reasonable expectations. Indeed that is what the law of contracts is all about. "The very strength and propriety of compensation statutes rest in the fact that where a business is charged with the care of injured employees, the hirers in that business of men and women whose daily tasks place them in jeopardy may insure against the liability imposed by the law." (*Western Indemnity Co.* v. *Pillsbury, supra,* 172 Cal. at p. 814.) Thus, a lawful agreement between the parties expressly stating that the relationship created is that of independent contractor should not be lightly disregarded when both parties have performed under the contract and relied on its provisions, for example by not insuring against risks assumed by the other party.

The Board also quoted and apparently placed some reliance on section 3357 which provides: "Any person rendering service for another, *other than as an independent contractor,* or unless expressly excluded herein, is *presumed* to be an employee." (Italics added.) Any reliance by the Board on that statutory provision was manifestly misplaced. By the very language of the statute, the presumption does not apply to a person rendering service for another as an independent contractor. Whether the applicant here was an independent contractor or an employee is the very question to be decided; the presumption is therefore inapplicable.

The pertinent statutory provision is section 2750.5. (See fn. 1, *ante,* and following text.) Under that section, Morse established that the applicant was an independent contractor. The manner of performance was within his control; the result of the work and not the means by which it was to be accomplished was the primary factor bargained for; applicant was engaged in or held himself out as being engaged in an independent business; the subcontract agreement expressly provided for the relationship of independent contractor; the contract was not a subterfuge to avoid employee status; and the applicant was separately licensed by the State of California to perform the services.

In the end, all that is left is an appeal to "liberal construction" as mandated by section 3202. We respond in the words of the California

Supreme Court in *Western Indemnity Co.* v. *Pillsbury, supra*, 172 Cal. at page 814: "This court has always endeavored to construe the Workmen's Compensation Act liberally and with a view to carrying out its benevolent purposes, but we cannot see why we should discard the wisdom and learning of the past in our efforts to decide what the legislature intended by the language used. Especially should we avoid all temptation to stretch the law to cover individual cases where those demanding compensation arouse our sympathy. This man ... was badly injured, but we should not for that reason shut our eyes to the fact that he was an independent contractor and not an employee.... It would be unfair to the employers, unfair to the insurers, and unfair to the legitimate beneficiaries of the statute for us to try by every devious twist of interpretation to uphold every award made, merely because the person seeking it might be unfortunate."

The Board's decision after reconsideration is annulled.

McDaniel, J., and Morris, J., concurred.