Filed 6/12/13; pub. order 7/11/13 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ERIN BEAUMONT-JACQUES, | B239855 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC438608) |
| v. | |
| FARMERS GROUP, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Barbara M. Scheper, Judge.  Affirmed.

Law Offices of William B. Hanley and William B. Hanley for Plaintiff and Appellant.

Barger & Wolen, Royal F. Oaks and Michael A. S. Newman for Defendants and Respondents.

## INTRODUCTION

Plaintiff and Appellant Erin Beaumont-Jacques (Appellant) sued various entities. After demurrers below, the remaining defendants are five affiliated insurers (Signatory Defendants) and Farmers Group, Inc. (collectively, Respondents).

This appeal challenges the granting of Respondents' motion for summary judgment. Appellant claims the trial court erred in concluding as a matter of law that she was an independent contractor, and that she presented no triable issues of fact regarding her causes of action. Appellant also claims that her district manager classification was a "scheme" to avoid tax and Labor Code obligations.

The record below demonstrates that Appellant exercised meaningful discretion with reference to her efforts. While Respondents had input over the quality and direction of those efforts, they did not have sufficient "control of the details" with respect to those efforts. Appellant was thus an independent contractor and all of her claims must fail. We accordingly affirm.

## FACTUAL SUMMARY

After several years working for the Signatory Defendants, in September 2005, Appellant became one of their district managers by executing the District Manager Appointment Agreement (DMAA). Appellant thereafter recruited and recommended persons to become agents solely for the Signatory Defendants; if the latter accepted such a person, Appellant trained and motivated that agent to market only the Signatory Defendants' insurance products. While she herself did not sell those products, Appellant could represent Respondents, but no other insurers. According to Appellant, she received many accolades from Respondents. In October 2009, Appellant voluntarily terminated this relationship, receiving, in two payments, $196,085.20 from the Signatory Defendants pursuant to the DMAA.

In May 2010, Appellant filed this lawsuit. Appellant later filed the operative pleading, the Third Amended Complaint, containing causes of action for breach of contract, breach of the implied covenant, sex discrimination and Business and

Professions Code section 17200 violations. After discovery, Respondents filed a motion for summary judgment which the trial court granted. This appeal followed.

Among other things, the DMAA addresses certain subjects, which form the contractual framework for this dispute. For instance, paragraph H states: "Nothing contained herein is intended or shall be construed to create a relationship of employer and employee. The time to be expended by District Manager is solely within his/her discretion, and the persons to be solicited and the area within the district involved wherein solicitation shall be conducted is at the election of the District Manger. No control is to be exercised by the Companies over the time when, the place where, or the manner in which the District Manager shall operate in carrying out the objectives of this Agreement provided only that they conform to normal business practice" and to applicable law. Appellant testified at her deposition that, when she signed the DMAA, she understood she was an independent contractor and the Signatory Defendants thought so too.

According to paragraph B.1 of the DMAA, Appellant will "recruit for appointment and train as many agents acceptable" to the Signatory Defendants. Appellant received commission "overwrites" based upon the sales subsequently produced by those agents, with Respondents overseeing the amount of such compensation. In connection with those and related efforts, the DMAA prescribed that the Signatory Defendants could establish "goals and objectives" with respect to the sales of their products. Appellant was required to conform to Respondents' "regulations, operating principles and standards" and engage in "normal good business practice." The Signatory Defendants could verify Appellant's efforts by, for instance, examining her records. Paragraph D of the DMAA afforded each party the option to cancel, "without cause . . . on 30 days written notice." Appellant stresses, as questions of fact, the significance of these and related factors.

## ISSUES

Was the trial court correct in determining, as a matter of law, that Appellant was an independent contractor? If so, were all of Appellant's claims properly dismissed by that court?

## STANDARD OF REVIEW

"[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) "A defendant . . . has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action." (Code Civ. Proc., § 437c, subd. (p)(2).) "Once the [movant] has met that burden, the burden shifts to the [other party] to show that a triable issue of one or more material facts exists as to that cause of action or defense." (*Ibid.*) The party opposing summary judgment "may not rely upon the mere allegations or denials of its pleadings," but rather "shall set forth the specific facts showing that a triable issue of material fact exists." (*Ibid.*)

Where summary judgment has been granted, we review the trial court's ruling de novo. (*Aguilar*, *supra*, 25 Cal.4th at p. 860.) We consider all the evidence presented by the parties in connection with the motion (except that which was properly excluded) and the uncontradicted inferences that evidence reasonably supports. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) We affirm summary judgment where the moving party demonstrates the existence of no triable issue of material fact and the entitlement to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

## DISCUSSION

1.      *Standards For Independent Contractor*

As this court said in *Angelotti v. The Walt Disney Co.* (2011) 192 Cal.App.4th 1394, 1404 (*Angelotti*)*,* the "existence of an employment relationship is a question for the trier of fact, but can be decided by the court as a matter of law if the evidence supports

4

only one reasonable conclusion." The pivotal inquiry looks at the "control of details" - i.e., whether the principal has " 'the right to control the manner and means of accomplishing the result desired. . . .' " (*S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 350.)

The California Supreme Court has declared that "the owner may retain a broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the independent contract—including the right to inspect [citation], the right to make suggestions or recommendations as to details of the work [citation], the right to prescribe alterations or deviations in the work [citation]—without changing the relationship from that of owner and independent contractor . . . ." (*McDonald v. Shell Oil Co.* (1955) 44 Cal.2d 785, 790 (*McDonald*).)

Some cases say the principal's control must be "complete" in order to find an employer/employee relationship. (See, e.g., *Mission Ins. Co. v. Workers' Comp. Appeals Bd.* (1981) 123 Cal.App.3d 211, 221 (*Mission*).) Other cases say the principal must have "complete" or "authoritative" control to find such a relationship. (See, e.g., *Varisco v. Gateway Science & Engineering, Inc.* (2008) 166 Cal.App.4th 1099, 1103 (*Varisco*).) In any event, the key is "the right to control, rather than the amount of control which was exercised." (*Ibid.*) Several decisions (e.g., *McDonald* and *Varisco*) focus upon the principle that a principal may oversee the results, but not the means, of the work in question. Under any standard, Appellant's assertion that she was an employee is rejected.

2. *Importance of* Mission *and* Millsap

*Mission* is a case with striking similarities to this lawsuit. There, the subcontract between the principal (Morse) and Blankenhorn and Blankenhorn's business entity, EDC, provided that: EDC was an independent contractor; EDC had the sole right to hire and fire its employees; and, EDC directed and supervised those employees. (*Mission*, *supra*, 123 Cal.App.3d at pp. 214-215.) Blankenhorn, whose tax returns stated he was self-employed, did not work specific hours, used his own vehicle and paid his own expenses; on the other hand, he attended lectures and classes at Morse, and wore a shirt with a Morse insignia. (*Id.* at pp. 216-217.)

5

Blankenhorn's eligibility for workers' compensation benefits turned on whether he was an employee or an independent contractor.  The court held:  "We believe that in reality only one reasonable inference can be drawn from the evidence in the case at bench and that therefore [Blankenhorn] was an independent contractor at the time he was injured as a matter of law." (*Mission, supra,* 123 Cal.App.3d at p. 219.)  Moreover, the "Board's enumeration of [certain] facts in connection with its conclusion that Morse had the right to exercise control suggests that the Board may have had a mistaken concept of the type of control that has significance in a situation such as this.  It concluded that Morse had the power to affect [Blankenhorn's] conduct. Of course it did.  But the fact that Morse prescribed standards of performance and that [Blankenhorn] on occasion attended lectures or classes concerning proper methods of installation and service was not evidence that Morse controlled *the manner in which the desired result was to be achieved*." (*Id*. at p. 221.)

In rejecting the contention that the written agreement was "a subterfuge by Morse to avoid the employer-employee relationship," the court enumerated several factors, including Morse's establishment of work quality standards which "constitutes evidence that [Blankenhorn] was an independent contractor." (*Mission, supra,* 123 Cal.App.3d at pp. 223, 224.)  The court added that agreement "expressly stating that the relationship created is that of independent contractor should not be lightly disregarded when both parties have performed under the contract . . . ." (*Id*. at p. 226.)

In *Millsap v. Federal Express Corp.* (1991) 227 Cal.App.3d 425, 428-429 (*Millsap*), Pence delivered packages for North County Express (NCE).  During one such delivery, she struck Millsap's automobile; she sued Pence and NCE.  The court ruled, as matter of law, that NCE was not liable for Pence's negligence because, at the time of the accident, he was acting as its independent contractor.  That is, NCE lacked sufficient control to convert the relationship into employer/employee:  " 'Even one who is interested primarily in the result to be accomplished by certain work is ordinarily permitted to retain some interest in the manner in which the work is done . . . .' " (*Id*. at p. 432.)  The court observed that Pence understood he was an independent contractor.

6

He used his own car, purchasing its gas, repairs and liability insurance. He received no standard employee benefits, with no taxes withheld from his paychecks. While Pence was provided with instructions and manuals, that made no substantive difference.

Undisputed evidence establishes, similar to decisions such as *Mission* and *Millsap,* that Appellant exercised meaningful discretion by, for instance: recruiting agents for and, when selected, training and motivating those agents to sell the Signatory Defendants' products; determining her own day-to-day hours, including her vacations; on most days, fixing the time for her arrival and departure at her office and elsewhere, including lunch and breaks; preparing reports for and attending meetings of the Signatory Defendants; hiring and supervising her staff, i.e., those who worked at her office, while remitting payroll taxes for them as employees; performing other administrative tasks, including resolving problems; paying for her costs such as marketing, office lease, telephone service and office supplies; deducting those costs as a business expense in her personal tax returns; and, identifying herself as self-employed in those returns. Lastly, the DMAA specifically provided there was no employer/employee relationship.

3.     *Appellant's Arguments*

While Respondents' Brief discusses at some length the decisions in *Mission* and *Millsap*, Appellant's Reply Brief does not explain why those two decisions are not applicable to or distinguishable from this dispute. Instead, Appellant contends the factors we have previously discussed were set up as a "facade to make the relationship look like an independent contractor relationship when it was not" and were "simply the result of [Respondents'] illegal misclassification of Appellant as an independent contractor." Nothing in the record, beyond argument, specifically supports these two contentions. As previously stated, the *Mission* court rejected a similar contention.

According to Appellant, the Signatory Defendants' "right to control the means and manner" of her efforts is captured in the DMAA's command that she must conform to their "normal business practice" and "goals and objectives." Appellant also relies upon the deposition testimony of her supervisor, Robert Anderson. (Mr. Anderson was the District Marketing Manager.) He testified that, among other things, he expected annual

business plans and received them from the nine district managers, including Appellant, in his area. He arranged for meetings at which Appellant and those other district managers were expected to and did attend. Furthermore, he acknowledged his sole final authority to hire and dismiss any agent in Appellant's district, and to provide a two-year subsidy (partially at her expense) for her district's newly hired agents. While Mr. Anderson had such authority and the DMAA articulated those points, that does not mean Respondents controlled to any meaningful degree the means by which Appellant performed and accomplished her duties as a district manager.

Appellant asserts the trial court erroneously agreed with Respondents' objections to the Declaration of James R. Zentner, submitted in her opposition to the motion for summary judgment. That court "sustained" those objections, primarily on the grounds of relevancy. Mr. Zentner was once a district manager of Respondents, but in a district different than Appellant's; his supervisor was Chris Brennan, not Mr. Anderson. Nothing in Mr. Zentner's lengthy declaration mentions Appellant. We see no error in excluding this declaration; in so ruling, the trial court thus committed no "miscarriage of justice." (*Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1480.)

Appellant emphasizes the "New District Manager Minimum Acceptable Performance Standards"(the Performance Standards). This two-page document, dated October 1, 2005 (the same day Appellant signed the DMAA and evidently given to her around that day), explains the need for Appellant to bring on, in definitive time periods while a new district manager, a specified number of Reserve and Career agents for her district; if Appellant failed to realize these objectives "and there are no mitigating circumstances, your appointment agreement will be terminated." This document ends with these words: "These requirements do not in any way amend or modify your District Manager's Appointment Agreement or your status as an independent contractor. [¶] Keep in mind we view the above criteria as minimum levels of performance. You should develop plans to exceed these minimum performance standards."

This document, though, says nothing about the manner in which the Signatory Defendants want or expect Appellant to comply with these minimum performance

8

standards, nor the manner in which she should satisfy them. This document is a classic example of the setting of results while leaving the means to the Appellant.

In May 2005, at the request of Mr. Anderson, Appellant prepared a "District 95-39 Business Plan Draft", discussing what she planned to do if appointed as a district manager. Among other things, this 30-page submission addressed "Agency Development" and Appellant's own "priority to develop the district by expanding our distribution system through agency development." So, a few months before signing the DMAA, Appellant had already formulated the manner in which she would accomplish certain objectives with agents in her district - another example of articulating the means to achieve Respondents' results.

Significantly, Appellant's contentions overlook other legal settings where the court rejected a similar "I-am-an-employee" assertion. For example, attendance at meetings and wearing logos did not establish an employer/employee relationship in *Mission*. In addition, the principal's powers in *McDonald* (quoted above, e.g., "to insure satisfactory performance") still yielded a finding there of an independent contractor relationship. (*McDonald, supra*, 44 Cal.2d at p. 790) As there was no consequential authority to control "*the manner in which the desired result was to be achieved*" (*Mission, supra,* 123 Cal.App.3d at p. 221), no employer/employee relationship existed. The same analysis applies herein.

4.      *The Right to Terminate*

Appellant points to Respondents' right to discharge her. But Appellant voluntarily resigned. In any event, according to paragraph D (AA 32), the DMAA "may be cancelled without cause by either the District Manager or the Companies on 30 days written notice . . . ." As *Varisco, supra,* 166 Cal.App.4th at page 1108 declared, " 'the right to terminate their arrangement was a mutual one. [¶] We think these circumstances show an association, rather than the relation of employer and employee.' "

Appellant cites *Angelotti*, in which this court declared the "right to discharge at will without cause" is "strong evidence in support of an employment relationship." (*Angelotti, supra*, 192 Cal.App.4th at p. 1404.) But that was a workers' compensation

claim with an unilateral contract. Here, each side could cancel. Her voluntary departure and her contract's mutuality augurs against Appellant.

The court in *Mission*, another workers' compensation case, did indicate the threat of termination is one indicator of a principal's control, to be evaluated along with other factors; that court, though, rejected the employer/employee assertion. Moreover, even "if one or two of the individual factors might suggest an employment relationship, summary judgment is nevertheless proper when . . . all the factors weighed and considered as a whole establish that [plaintiff] was an independent contractor and not an employee." (*Arnold v. Mutual of Omaha Ins. Co*. (2011) 202 Cal.App.4th 580, 590.)

5.      *Conclusion*

In view of the relevant factors and applicable case law, we believe that a weighing and consideration of the record as a whole leads to the conclusion the trial court properly ruled, as a matter of law, that Appellant was an independent contractor.

Because of this conclusion, it is not appropriate or necessary to analyze further. That is, in light of our finding that Appellant was not an employee, all of her causes of action are not viable as a matter of law. Her first two causes of action are breach of contract and breach of the implied covenant; premised upon the allegation of an employer/employee relationship, these claims cannot succeed as Appellant was an independent contractor.

The third cause of action is for sex discrimination which, Appellant asserts, violates Article I, section 8, of the California Constitution; Appellant, though, as an independent contractor lacks standing to pursue such a claim. (*Sistare-Meyer v. Young Men's Christian Assn.* (1997) 58 Cal.App.4th 10, 16-17 (rejecting claim for sexual discrimination and violation of Article I, section 8).) The fourth cause of action alleges that the failure to classify Appellant as an employee violated applicable law and the "unlawful" prong of Business and Professions Code section 17200; that claim falls too, as Appellant was not an employee.

**DISPOSITION**

The judgment is affirmed.  Respondents are awarded their costs.

HEESEMAN, J.[*]

We concur:

CROSKEY, Acting P. J.

KITCHING, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*CERTIFIED FOR PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ERIN BEAUMONT-JACQUES, | B239855 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC438608) |
| v. | |
| FARMERS GROUP, INC., et al., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendants and Respondents. | [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter filed on June 12, 2013, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

[There is no change in the judgment.]