Filed 10/29/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MILAN BACOKA, SR., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> BEST BUY STORES, L.P., <br><br> Defendant and Respondent. | B306900 <br><br> (Los Angeles County <br> Super. Ct. No. BC688588) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Yolanda Orozco, Judge.  Affirmed.

Furtado Law and David J. Furtado for Plaintiffs and Appellants.

Lewis Brisbois Bisgaard & Smith, Jeffry A. Miller, Ernest Slome; Prindle Goetz, Barnes & Reinholtz and R. Derek Classen for Defendant and Respondent.

\* \* \* \* \* \* \* \* \* \*

Plaintiffs Milan and Bernardica Bacoka sued defendant Best Buy Stores, L.P. for damage to their property caused by a water leak from a negligently installed washing machine purchased from and allegedly installed by Best Buy. Best Buy moved for summary judgment on the ground that an independent contractor installed the washing machine. The trial court granted summary judgment in Best Buy's favor. We affirm, finding no material dispute that the washing machine was installed by an independent contractor.

## BACKGROUND

Plaintiffs sued Best Buy, alleging several theories of negligence. The complaint alleged that plaintiffs own an apartment complex in San Pedro, California, and that plaintiffs' tenant purchased a Samsung washing machine from Best Buy. The washing machine was negligently installed by Best Buy, causing a water leak which resulted in significant damage to plaintiffs' property, rendering several units uninhabitable. Plaintiffs' theory of causation was that the hot water supply hose was negligently threaded onto the machine, causing the leak.

Best Buy moved for summary judgment, arguing the washing machine was installed by an independent contractor and not by Best Buy, and that it was therefore not responsible for the damage to plaintiffs' property. Best Buy offered evidence that its subsidiary, Best Buy Warehouse Logistics, Inc., had a contract with Penn Ridge Transportation, Inc. (the Master Services Agreement). Under that agreement, Penn Ridge "shall provide services . . . as a duly licensed broker of property by the U.S. Federal Motor Carrier Safety Administration . . . , not as a motor carrier, and, as such, is engaged in the business of arranging for transportation of Merchandise between points in the United

States and other destinations for accounts, such as Best Buy, utilizing the services of independent motor carriers to effectuate the pick-up, delivery, and in-home installation of Merchandise originating from or consigned to Best Buy or its Customers."

Under the agreement, Penn Ridge is obligated to subcontract with third party carriers to deliver and install Best Buy merchandise. Carriers are defined under the Master Services Agreement as "any independently owned and operated motor carrier under contract with [Penn Ridge] who may also provide Installation Services as part of its overall business." Under the agreement, Penn Ridge must require carriers to "furnish, provide and maintain all vehicles, equipment, tools, labor, and supervision necessary, required, or proper for the safe and efficient performance of the obligations" under the agreement.

The carriers' trucks did not display the Best Buy name or logo. The delivery teams did not wear any Best Buy branded clothing. The equipment used by the carriers' delivery teams varied by carrier, as each carrier had its own best practices and determined what equipment was necessary to carry out the installations.

The agreement also requires Penn Ridge to "contract with Carriers that are proficient in all aspects of Services including but not limited to: (1) customer services skills; (2) conflict management . . . ; (3) customer education . . . ; (4) illustrate the work performed after the delivery has occurred; (5) offer to teach the Customer how to use their appliance or TV (at no extra charge); and, (6) ask the Customer if they have any questions or concerns."

3

Penn Ridge found carriers by word of mouth, or by running ads. Penn Ridge alone determined if the carriers were qualified to provide necessary delivery and installation services, and entered into contracts with those carriers. The contracts provided that the carriers did not have an exclusive right to perform subcontracted services for Penn Ridge, and that Penn Ridge did not have an exclusive right to the carriers' services. The contracts further stated the carriers were providing services as independent contractors, with full control over their personnel, and the carriers were responsible for their own workers' compensation and unemployment compensation.

Under the contract between Best Buy and Penn Ridge, Best Buy "[f]or quality assurance purposes . . . will notify [Penn Ridge] of its dissatisfaction with Carriers for any reason at any time . . . ." If Best Buy provides notice of dissatisfaction, Penn Ridge "will investigate the matter and take appropriate steps in accordance with its agreement with the Carrier. Any such notice given by Best Buy will not be construed . . . to be a direct or indirect instruction to terminate or otherwise affect [Penn Ridge's] relationship with its own employees or Carrier."

In this case, the washing machine was delivered by a carrier, B3D Transportation, pursuant to its agreement with Penn Ridge. The owner of B3D, David Santo Padilla, considered himself an independent contractor. He trained his employees how to make deliveries and installations, and neither Best Buy nor Penn Ridge told him how to train his employees, or which tools were required. Mr. Padilla knew which tools were required based on his own trade experience.

In opposition to the motion for summary judgment, plaintiffs argued certain provisions in Best Buy's agreement with

4

Penn Ridge show Best Buy has control over the delivery and installation of appliances.[1] Plaintiffs offered evidence that while Best Buy does not train carriers to install Best Buy products, Best Buy occasionally audits carriers by "rid[ing] behind installers as they are entering homes [to] watch the work and report it back to [the] third-party to let them know it was done correctly or incorrectly." Best Buy also requires on-time delivery, and that installation is done correctly the first time. Best Buy gave Penn Ridge access to its routing system so that Penn Ridge could route drivers to effectuate deliveries. The agreement provides that Penn Ridge shall require all contracted carriers to comply "with all policies and procedures promulgated by Best Buy including, without limitation, safety procedures, Best Buy's Vendor Privacy and Security Policy and its policy regarding gifts and gratuities . . . ."

The agreement also required Penn Ridge to keep a field management team to facilitate the carriers' compliance "with applicable standards that have been reviewed/approved by Best Buy." Penn Ridge was also to require its carriers to "provide real time data entry in Best Buy's systems in the normal process of completing" service orders, that they be available to provide services Monday through Saturday, and that they complete all

---

[1]     We note that plaintiffs' responsive separate statement in opposition to Best Buy's summary judgment motion makes no mention, whatsoever, of these provisions of the agreement, and it does not appear the trial court considered these provisions when making its ruling. Opposition separate statements must cite to facts and evidence for the evidence to be considered by the court. (*Madden v. Del Taco, Inc.* (2007) 150 Cal.App.4th 294, 300.)

services before 7:00 p.m.  Penn Ridge was required to contact Best Buy for "additional instructions" for delivery problems, such as the customer not being home.  Penn Ridge's contracts with carriers are required to provide that delivery teams wait at least 15 minutes for a customer to arrive home, and that they contact a Best Buy representative if the customer did not arrive within the 15-minute window to receive a release code documenting that services could not be completed.

The trial court granted the motion, finding there was no material dispute that B3D was an independent contractor. Judgment was entered on July 22, 2020, and this timely appeal followed.

## DISCUSSION

### 1.    Standard of Review

"[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) "Once the [movant] has met that burden, the burden shifts to the [other party] to show that a triable issue of one or more material facts exists as to [that] cause of action . . . ." (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 850.)  The party opposing summary judgment "shall not rely upon the allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists . . . ." (§ 437c, subd. (p)(2).) A triable issue of material fact exists where "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, at p. 850.)

Our Supreme Court has made clear that the purpose of the 1992 and 1993 amendments to the summary judgment statute was " 'to liberalize the granting of [summary judgment] motions.' " (*Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542; *Aguilar*, *supra*, 25 Cal.4th at p. 854.)  It is no longer called a "disfavored" remedy.  (*Perry,* at p. 542.)  "Summary judgment is now seen as a 'particularly suitable means to test the sufficiency' of the plaintiff's or defendant's case."  (*Ibid.*)  On appeal, "we take the facts from the record that was before the trial court . . . .  ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' "  (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037, citation omitted.)

## 2.  Independent Contractor or Employee

Under the doctrine of respondeat superior, an "employer may be [vicariously] liable for the torts its employee commits while acting within the scope of . . . employment."  (*Yamaguchi v. Harnsmut* (2003) 106 Cal.App.4th 472, 481.)  " 'Employee[s]' include most persons 'in the service of an employer under any . . . contract of hire' . . . , but do not include independent contractors."  (*S. G. Borello & Sons, Inc. v. Dept. of Indus. Rel.* (1989) 48 Cal.3d 341, 349 (*Borello*).)

"The principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired."  (*Tieberg v. Unemployment Insurance Appeals Board* (1970) 2 Cal.3d 943, 946; see also *Borello*, *supra*, 48 Cal.3d at p. 350.)  However, no rigid test governs whether someone is an employee.  (*Arzate v. Bridge Terminal Transport, Inc.* (2011)

7

192 Cal.App.4th 419, 426.)  "[W]hile the right to control work details 'is the "most important" or "most significant" consideration, the authorities also endorse several "secondary" indicia of the nature of a service relationship.' " (*Id.* at p. 426.)

For example, " 'the right to discharge at will, without cause,' " is " '[s]trong evidence in support of an employment relationship.' " (*Borello*, *supra*, 48 Cal.3d at p. 350.)  Additional factors include:  "(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." (*Id.* at p. 351.)

When applying the control test, what matters "is not how much control a hirer exercises, but how much control the hirer retains the right to exercise." (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 533, italics omitted.) When the parties have a written agreement, "[s]elf-evidently, '[s]uch agreements are a significant factor for consideration' in assessing a hirer's right to control a hiree's work." (*Id.* at p. 534.) The contract defines the legal parameters of the parties' relationship, and "what matters is whether a hirer has the 'legal

8

right to control the [hiree's] activities.' " (*Ayala*, at p. 535, italics omitted.)

Nevertheless, " '[t]he owner may retain a broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the independent contract—including the right to inspect [citation], . . . the right to make suggestions or recommendations as to details of the work [citation], the right to prescribe alterations or deviations in the work [citation]—without changing the relationship from that of owner and independent contractor . . . .' [Citation.]" (*Beaumont-Jacques v. Farmers Group, Inc.* (2013) 217 Cal.App.4th 1138, 1143.)

"The determination of employee or independent-contractor status is one of fact if dependent upon the resolution of disputed evidence or inferences." (*Borello*, *supra*, 48 Cal.3d at p. 349.) The question is one of law if the evidence is undisputed. (*Ibid*.)

Here, the undisputed evidence established the washing machine was installed by an independent contractor, and not Best Buy's employees. Best Buy contracted with Penn Ridge to serve as a broker of transportation services from third party, independent carriers, who were to supply their own employees, trucks, and tools. Penn Ridge alone determined whether the carriers were qualified to provide the contracted services. Carriers were not trained by Best Buy or told how to perform their services. Best Buy had no power to terminate carriers or even to recommend that Penn Ridge terminate a carrier; that was solely Penn Ridge's decision.

Penn Ridge's contract with Best Buy, and its contracts with carriers, provided the carriers were independent contractors. Carriers had no contract relationship with Best Buy. The

carriers' contracts with Penn Ridge were not exclusive; the contracts specified the carriers were free to contract their services with companies other than Penn Ridge.

Although Best Buy retained some right to control aspects of the *delivery* and *routing*, that does not create a material dispute as to exercise of control over the manner and means by which the washers are *installed*. Best Buy's control was to ensure the satisfactory performance of services and did not change the nature of the relationship of the carriers from independent contractors of Penn Ridge to employees of Best Buy.

### 3. Requests for Judicial Notice

Plaintiffs have filed two requests for judicial notice. Plaintiffs' first request asks us to take notice of a federal district court order granting preliminary approval of a settlement of a class action lawsuit against Penn Ridge and Best Buy, where the class alleged that delivery drivers were misclassified as independent contractors. Plaintiffs' counsel declared he discussed the existence of the order granting the settlement motion at the summary judgment hearing, but that there was no reporter present at the hearing. There is no indication from the court's ruling that it considered these matters. The district court ruling is irrelevant to these proceedings.

Plaintiffs' second request for judicial notice asks us to notice a federal complaint in intervention filed by plaintiffs' insurer against Best Buy, which was assigned to plaintiffs before judgment was entered in this case. In the complaint, the insurer sought to recover from Best Buy sums paid under the plaintiffs' insurance policy related to the water leak. There is no indication the trial court considered or was asked to consider the pendency of these claims. This pleading is also irrelevant.

10

Accordingly, the requests for judicial notice are denied.

**DISPOSITION**

The judgment is affirmed.  Respondent is awarded its costs on appeal.



GRIMES, Acting P. J.

WE CONCUR:


WILEY, J.


OHTA, J.*

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11