Filed 11/14/13  Rabanal v. Rideshare Port Management CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| FERDINAND RABANAL et al., | B239708 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. Nos. BC432509 & BC437620) |
| v. | |
| RIDESHARE PORT MANAGEMENT LLC, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Yvette M. Palazuelos, Judge.  Affirmed.

Law Offices of John J. Jackman and John J. Jackman for Plaintiffs and Appellants.

Epstein Becker & Green, David Jacobs, William O. Stein and Rhea G. Mariano for Defendants and Respondents.

———————————————

**INTRODUCTION**

At issue in these two consolidated actions is whether plaintiffs Jose Diaz and Ferdinand Rabanal (collectively plaintiffs) are employees of, or independent contractors for, defendant Rideshare Port Management LLC d/b/a Prime Time Shuttle (RPM), and managing member Rattan Joea and his wife, Parminder Joea (collectively defendants). Plaintiffs sued defendants seeking to recover for various alleged violations of the wage and hour laws. The trial court granted defendants' motions for summary judgment, ruling as a matter of law that plaintiffs were not employees who would be entitled to the protection of the wage and hour laws but independent contractors. Plaintiffs appeal. We hold there is no triable issue of material fact and so, as a matter of law, plaintiffs are independent contractors. Plaintiffs exercised control over the manner and means of the work. Although RPM set some standards of dress, implemented to an extent a demerit system, and utilized a centralized dispatch system, many aspects of the dress code and dispatch system were required by the City of Los Angeles (the City) and the Public Utilities Commission (PUC) in order for RPM to operate at Los Angeles International Airport (LAX) and the evidence fails to show that the demerit system went beyond the right to ensure satisfactory performance to the public. Accordingly, we affirm the judgment.

**FACTUAL AND PROCEDURAL SUMMARY**

1. *The lawsuit*

Rabanal and Diaz were van drivers or "operators" whose work ordinarily consisted of transporting passengers to and from their residences and various airports or cruise ship terminals. Diaz covered mostly LAX and cruise ships docked in San Pedro. Rabanal mainly took passengers to and from LAX, but sometimes to other airports. Each worked for RPM for about a year, although their tenure there did not overlap.

Rabanal and Diaz independently commenced lawsuits against RPM and the Joeas alleging causes of action for violations of the wage and hour laws. They alleged defendants made illegal deductions from wages (Lab. Code, § 2802); failed to pay wages for all regular hours worked; failed to pay overtime; failed to provide meal breaks; failed

2

to provide itemized statements (Lab. Code, § 226); violated Labor Code section 221; failed to compensate for all hours worked (Lab. Code, § 1198); committed fraud to avoid compliance with the wage and hour laws, and engaged in unfair business practices by violating the above wage and hour laws (Bus. & Prof. Code, § 17200). Plaintiffs also sought declaratory and injunctive relief. The trial court consolidated plaintiffs' lawsuits.

Defendants answered the complaints by generally and specifically denying each allegation. RPM and the Joeas then moved for summary judgment on the ground there were no disputes of material fact with the result as a matter of law, Rabanal and Diaz were independent contractors and not employees, thus vitiating all causes of action.

2. *The evidentiary showing in defendants' summary judgment motions*

Reviewing the record according to the applicable rules of review (*Hawkins v. Wilton* (2006) 144 Cal.App.4th 936, 939-940), it shows that state and local laws and regulations governed the manner in which RPM and other entities transact business at airports and cruise ship terminals. RPM, who conducts business under the name "Prime Time" and "Prime Time Shuttle," is licensed by the PUC to operate as a passenger stage corporation. RPM's right to operate at LAX was afforded by its concession agreement (concession agreement) with the City. Among other matters, the concession agreement required that: shuttles and drivers have identically colored clothing and markings to be readily identifiable as being with the concessionaire; concessionaires maintain specified insurance; all vehicles operating under RPM's certificate display the name or trade name of the carrier in sufficiently large letters to be readable; the concessionaire maintain a centralized dispatch system and telephone number for the use by the public.

Beginning in August 2005, RPM contracted with Airport Transportation Associates, LLC (ATA) to receive "transportation services," i.e., operators. ATA was a limited liability company comprised of operators. The ATA-RPM contract provided in particular, "it is mutually understood and agreed that [ATA] is performing as an independent contractor. [RPM] shall neither have nor exercise any control or direction over the methods by which [ATA], or personnel under his control, shall perform their work and functions. The sole interest and responsibility of [ATA] shall be to assure that

3

the services covered by this Agreement shall be performed and rendered in a competent efficient and satisfactory manner and in compliance with all . . . laws, rules and regulations." ATA provided its operators with any procedures and processes they would need in order to work under RPM's trade name and to comply with specific airport regulations. Among the services ATA provided its members was negotiated group automobile liability insurance policies and cell phone rates. ATA also received payment for the operators' services to RPM and made distributions to individual operators. ATA issued IRS K-1 forms to operators reflecting their compensation for services provided and their membership distribution. In 2009, ATA disbanded. RPM then entered into contracts with individual operators for transportation services through owner-operator sub-carrier agreements.

Procedurally, RPM's dispatch system, run by Red Vans Management Services, took reservations from passengers and offered those passengers to drivers as fares. Dispatch informed each operator by telephone or Blackberry of the passenger's location and requested pickup time. Operators decided when to leave for the pickup, the route to take to and from pickups, and whether to return to the airport lot for another fare. Operators were not required to communicate these plans with RPM. Operators were not assigned to, or restricted to, any geographical area and did not need RPM's approval for routes. Operators could decline to accept a fare that dispatch offered.

Dispatch was not the only source of fares. Operators could go to an airport and drive "loops" around the terminals to pick up unscheduled passengers who wanted rides but had not made prior reservations. In fact, Rabanal testified he made more money picking up unscheduled passengers in the "loops" than he did by driving passengers who had reserved through dispatch. Additionally, operators could solicit fares from other transportation networks such as Expedia, Go Airport, and Shuttle Fare. If an operator wanted to work at an airport other than LAX, he or she had to apply to the airport for a permit with that airport to pick up unscheduled passengers there.

Operators were paid by the fare. They collected money from passengers and submitted reconciliation statements to ATA's accounting service or to Red Vans

4

Management Services who would deduct expenses, such as insurance premiums or phone charges.

RPM did not set a weekly or monthly schedule for operators. Operators had no specific time to start or end work; they determined for themselves when they wanted to work. An operator could ask another driver to fill in for a fare that he or she had already accepted from dispatch. Rabanal testified he never reported to anyone on a daily basis other than to call dispatch to obtain fare assignments.

3. *The Manual and the Uniform Standard*

In 2008, Diaz says he received two documents, one entitled "Airport Transportation Association LLC For Member Information Operations Manual For Doing Business With Prime Time Shuttle" (Manual), and the other called "Prime Time Uniform Standard" (Uniform Standard). The authorship of the Manual and the Uniform Standard is disputed, but the contents of those documents is not. The Manual provided the protocol drivers followed to communicate with dispatch, the order in which fare opportunities were offered to those drivers, and the related disciplinary procedures. To maintain the driver's priority in line for fares, the driver had to regularly inform dispatch of his or her status.

The Manual described infraction levels and the related points assigned as the consequence for an infraction. However, Rabanal testified that the "points" system actually carried no punishment. Asked "[W]hat would happen if you got points[?] . . . would you get punishment for it[?]" Rabanal replied, "*Nothing at all*."

According to the Manual, drivers signified their last run of the day with a drive to his or her "home sector or an adjacent sector" by "going yellow." Drivers could only "go yellow" after working 10 hours that day.

As explained, RPM's concession agreement with the City required that its drivers' attire conform to a "color scheme" in order not to "confuse the public," a description of which scheme was on file with the City. Accordingly, the Uniform Standard that Diaz received regulated clothing and personal appearance. It required black slacks, shoes, socks, and belt, a red Prime Time polo or white dress shirt and Prime Time tie, and

5

optional Prime Time hat and jacket. It also required neatly groomed facial hair, conservative earrings for women and none for men, no pony tails for men, hair no longer than the collar, and no driver could wear a necklace or excessively visible jewelry.

4. *Rabanal*

Rabanal held a permit from the PUC to operate as a charter-party carrier. He could provide services to other companies or to fares he cultivated on his own. He began driving with RPM in November 2008 and left in December 2009. Before commencing work with RPM, Rabanal spent his own money on: a down-payment on the lease of a van and on automobile insurance, maps and a GPS system, a Blackberry telephone for communicating with dispatch, a three-day training seminar, and a uniform that identified him with "Prime Time."

Rabanal could use his GPS, telephone, and van for any purpose when not driving for RPM. Rabanal could have purchased the van from any source, including a used car lot, as long as it had the required number of seats. He kept his van at home.

When he started working, Rabanal filled out and signed the "Airport Transportation Associates, LLC Application for Membership" and an "Owner-Operator Sub-Carrier Agreement" describing Rabanal's business relationship with RPM as "non-exclusive," and Rabanal as an "independent owner-operator/driver" who was "under no obligation to accept any dispatch request." That agreement also provided Rabanal would control his hours and insure his van. Rabanal later made an "incident report" to RPM in which he stated, " 'Please remember Im [*sic*] an Owner-Operator. We have no employee-employer relationship.' "

Rabanal recorded all his fares on "daysheets" and kept the cash or credit card payments he received from customers. Each week, he submitted his accounting to RPM, who subtracted expenses, the cash payments he had already received from passengers, and RPM's share from his account. Rabanal then received his compensation. Rabanal received a 1099 form from RPM but no W-2 form.

Rabanal could decline fares offered to him by dispatch. In deposition, Rabanal was asked: "if you only wanted to work three days on a given week, you could have

6

chosen to work the three days, it's just you wouldn't have made any money?" Rabanal responded, "Yeah. And still owe [RPM] the same amount."

Rabanal was not automatically assigned fares, but first had to call dispatch to request an assignment. Rabanal alleges that he was once "locked out" from receiving fares from dispatch, meaning he would not receive fares on his Blackberry. However, he acknowledged that happened because he had not paid off all of the fees he owed to RPM.

5. *Diaz*

Diaz contacted RPM to inquire about business opportunities. After deciding to drive with RPM, Diaz attended a three-day training course based on policies documented by ATA. He drove for RPM between June 2007 and November 2008. During that time, Diaz was a member of ATA. He filled out and signed the "Airport Transportation Associates, LLC Acknowledgement / Declaration" which states, "I, Jose Diaz, hereby acknowledge that I have been fully informed of the benefits and responsibilities of membership in [ATA]. . . . [¶] . . . I declare that I am a 'member' of [ATA]."

Diaz also formed Harmony's Transportation, LLC and obtained a separate permit from the PUC to operate as a charter-party carrier, which permit was not exclusive to RPM. He testified that he formed his company after an RPM employee told him that doing so would allow him to add additional vans and drivers and "generate more income" for him. Diaz did not hire any additional drivers because he decided that "the business wasn't there."

Like Rabanal, Diaz understood that he could decide how often and how many hours he wanted to work and when. Diaz could choose to work only three days in a week. Thus, Diaz could decide how much money he would make. Also like Rabanal, Diaz made investments in his equipment, such as GPS, a Thomas Guide, a Blackberry telephone, and a van. After he stopped working for RPM, Diaz sold his van.

Diaz testified that he was locked out at least three times for refusing business. Once, he was locked out because he went to a meeting about driving for an RPM competitor. However, someone at RPM determined that the lockout had been a mistake.

7

In one instance, dispatch assigned him a fare to Ventura, which he refused, and so he was locked out.

6. *The trial court's ruling*

Based on this showing, the trial court granted defendants' summary judgment motions. The court first ruled that Rattan Joea was not plaintiffs' employer because Joea was an individual corporate agent acting within the scope of his agency as the managing member of RPM. Rattan's wife Parminder Joea had no role at all in RPM. Turning to RPM's motion, the trial court ruled that there were no triable factual issues and so as a matter of law, Rabanal and Diaz were independent contractors. The court reasoned that "[t]he most important factor - the right to control the manner and means of accomplishing the result desired - weighs almost entirely in [RPM's] favor." Finally, the court ruled that the undisputed facts showed that RPM made no misrepresentations of fact with the result the fraud cause of action failed. After the trial court entered judgment in favor of all defendants, plaintiffs filed their timely appeals.

## CONTENTIONS

Plaintiffs contend the trial court erred in granting summary judgment.

## DISCUSSION

1. *Standard of review*

A motion for summary judgment is properly granted when there are no triable issues of material fact and so the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment bears the burden of persuasion that one or more elements of the cause of action cannot be established or there is a complete defense thereto. (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 850 (*Aguilar*); Code Civ. Proc., § 437c, subds. (o) & (p)(2).)

On appeal from a judgment entered after the grant of summary judgment, we review the trial court's decision de novo. (*Aguilar*, *supra*, 25 Cal.4th at p. 860.) In so doing, we follow the same three-step analysis that the trial court applies. (*Hawkins v. Wilton*, *supra*, 144 Cal.App.4th at pp. 939-940.) First, we identify the issues framed by the pleadings. Second, we determine whether the moving party has established facts

justifying judgment in its favor as a matter of law. Third, if the moving party has carried its initial burden, we determine whether the opposing party has demonstrated the existence of a triable issue of fact that is material to the cause of action. (*Ibid*.) A triable issue of material fact exists if the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. (*Aguilar*, at p. 850.) We consider all evidence presented by the parties in connection with the motion -- except that which was properly excluded -- (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476) by strictly construing the moving party's evidence and liberally construing the opposing party's evidence (*Barber v. Chang* (2007) 151 Cal.App.4th 1456, 1463), but we may not weigh the evidence or conflicting inferences. (*Aguilar*, at p. 856; Code Civ. Proc., § 437c, subd. (c).)

2. *The law of employees versus independent contractors*

The sole issue raised by the pleadings is whether plaintiffs on the one hand are independent contractors, or on the other hand are employees of RPM who would thus be entitled to the protections of the wage and hour laws. "A person rendering service for another, other than as an independent contractor, is presumed to be an employee. (Lab. Code, § 3357.) The alleged employer has the burden of proof to overcome this presumption. [Citations.]" (*Faigin v. Signature Group Holdings, Inc.* (2012) 211 Cal.App.4th 726, 737, fn. 4.) "The determination of employee or independent-contractor status is one of fact if dependent upon the resolution of disputed evidence or inferences, and the [trial court's] decision must be upheld if substantially supported. [Citation.]" (*S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 349 (*Borello*).) When the evidence is undisputed, the question is one of law. (*Ibid.*) Thus, RPM had the burden to demonstrate there was no triable issue of material fact with the result plaintiffs were independent contractors as matter of law.

" '[T]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired. . . .' [Citations.]" (*Borello*, *supra*, 48 Cal.3d at p. 350; see also

9

Lab. Code, § 3353.[1])  "The existence of such right of control, and not the extent of its exercise, gives rise to the employer-employee relationship.  [Citations.]" (*Borello*, *supra*, at pp. 366-367 (dis. opn. of Kaufman, J.).)

Numerous secondary factors, derived largely from the Restatement Second of Agency (*Borello*, *supra*, 48 Cal.3d at p. 351), include, inter alia, "(1) whether or not the worker is engaged in a distinct occupation or an independently established business; (2) whether the worker or the principal supplies the tools or instrumentalities used in the work, other than tools and instrumentalities customarily supplied by employees; (3) the method of payment, whether by time or by the job; (4) whether the work is part of the regular business of the principal; (5) whether the worker has a substantial investment in the business other than personal services; (6) whether the worker hires employees to assist him.  [Citations.]" (*Torres v. Reardon* (1992) 3 Cal.App.4th 831, 837 (*Torres*), citing Labor Code, § 2750.5, subd. (a); *Borello*, *supra*, at pp. 350-351, 355.)  *Borello* listed some additional factors including,  (a) whether the parties believe they are creating the relationship of employer-employee; (b) the degree of permanence of the working relationship; (c) the alleged employee's investment in equipment or materials required for his task.  (*Borello*, *supra*, at pp. 351 & 355.)

" 'Generally, . . . the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' [Citation.]" (*Borello*, *supra*, 48 Cal.3d at p. 351.)

3.  *Application*

Applying the *Borello* factors to the undisputed facts marshaled by RPM, we conclude RPM has carried its burden to show as a matter of law that Diaz and Rabanal were independent contractors not employees.  This conclusion is demonstrated by the primary test of an employment relationship, namely "whether the ' "person to whom

---

[1]  Labor Code section 3353 reads:  " 'Independent contractor' means any person who renders service for a specified recompense for a specified result, under the control of his principal as to the result of his work only and not as to the means by which such result is accomplished."

10

service is rendered has the right to control the manner and means of accomplishing the result desired. . . .” ’ [Citation.]” (*Ali v. U.S.A. Cab Ltd.* (2009) 176 Cal.App.4th 1333, 1347; *Borello*, *supra*, 48 Cal.3d at p. 350.) “Under this rule, the right to exercise complete or authoritative control must be shown, rather than mere suggestion as to detail. A worker is an independent contractor when he or she follows the employer’s desires only in the result of the work, and not the means by which it is achieved. [Citation.]” (*Ali v. U.S.A. Cab Ltd.*, at p. 1347; accord, *Millsap v. Federal Express Corp.* (1991) 227 Cal.App.3d 425, 431.) “[T]he owner may retain a broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the independent contract—including the right to inspect [citation], the right to make suggestions or recommendations as to details of the work [citation], the right to prescribe alterations or deviations in the work [citation] — without changing the relationship from that of owner and independent contractor . . .” (*McDonald v. Shell Oil Co.* (1955) 44 Cal.2d 785, 790.)

Here, it is undisputed that plaintiffs independently determined how to perform their jobs. They decided when they wanted to work and whether they wanted to obtain fares from RPM’s dispatch, or drive loops, or solicit fares from other transportation networks such as Expedia, Go Airport, and Shuttle Fare. Plaintiffs could ask another driver to fill in for a fare already accepted from dispatch. Moreover, plaintiffs could determine the order of, and the routes for, pickup and drop-off and need never communicate these decisions to RPM. If plaintiffs wanted access to airports other than LAX, they had to apply independently for that right. There were no set hours or schedules. RPM’s “participation is limited to offering the assignments and paying . . . upon proof of delivery.” (*State Compensation Ins. Fund v. Brown* (1995) 32 Cal.App.4th 188, 202-203 [truck drivers held to be independent contractors where they made substantial capital investments in their own trucks; were paid on a job-by-job basis; and company functioned as broker who directed drivers to customer pick-up and drop-off locations].) In sum, RPM acted as a broker by providing a service to its customers and its control was limited to the results of plaintiffs’ work, namely picking up

11

and dropping off passengers, not how those results were achieved. (*Ibid*.; *Ali v. U.S.A. Cab Ltd*., *supra*, 176 Cal.App.4th at p. 1347.)

Moreover, RPM and plaintiffs operated with the understanding that plaintiffs were independent contractors. (*Borello*, *supra*, 48 Cal.3d at p. 351.) Rabanal wrote to RPM: " 'Please remember Im [*sic*] an Owner-Operator. We have no employee-employer relationship.' " Diaz created his own LLC and obtained a separate permit from the PUC so he could operate a fleet of vans with drivers who would drive for him. In *Merchants Home Delivery Serv., Inc. v. N. L. R. B*. (1978) 580 F.2d 966, all but one of the delivery operators owned their own equipment and were doing business as corporations or partnerships. All had the right to employ their own helpers to assist and several paid the relevant employment taxes themselves. Sometimes they engaged in business for other companies and all had a substantial investment in their equipment. (*Id*. at pp. 974-975.) The Ninth Circuit concluded that "the entrepreneurial characteristics of the owner-operators tip decidedly in favor of independent contractor status." (*Id*. at p. 974; accord, *Mission Ins. Co. v. Workers' Comp. Appeals Bd*. (1981) 123 Cal.App.4th 211, 224 (*Mission*) [plaintiff held himself out as being in business for himself; registered a fictitious name; and obtained a separate license from the state were "highly significant factors" supporting independent contractor finding].) Likewise here, the entrepreneurial character tips the result in favor of independent contractor status.

The *Borello* secondary factors further support the conclusion plaintiffs were independent contractors. Plaintiffs provided their own tools and instrumentalities necessary for their transportation services. They owned their own Blackberries and GPSs, supplied their own clothing, and owned or leased their own vans, paid for their insurance, and could hold their own PUC permits. Diaz sold his van when he ceased driving for RPM. Rabanal kept his van at home and understood he was under no restrictions as to its use. These instruments required thousands of dollars in investment on the part of plaintiffs. Plaintiffs were paid by the fare, not hourly, and were issued IRS K-1 and 1099 forms. Finally, both plaintiffs were entitled to hire employees to assist them. Diaz incorporated for that purpose. (*Torres, supra,* 3 Cal.App.4th at p. 837; citing

12

Lab. Code, §§ 2750.5, subd. (a) & 3353; *Borello, supra,* 48 Cal.3d at pp. 350-351, 355.) Plaintiffs' working relationship with RPM was decidedly not exclusive. Rabanal's Owner-Operator Sub-Carrier Agreement stated as much. Plaintiffs could solicit business for themselves through the internet, and hire their own employees.

This case is factually similar to *Mission, supra,* 123 Cal.App.3d 211, and compels the same result. There, Blankenhorn's business entity, EDC, had a subcontract with Morse Signal Devices under which EDC would send Blankenhorn (or one of his employees) on a service call to one of Morse's security alarm subscribers. (*Id.* at pp. 214–215.) Blankenhorn worked no specific hours, and invariably "alone without supervision;" his work was "inspected only in the event of a specific customer complaint;" he used his own vehicle and paid his own expenses, including liability and property damage insurance; for his compensation, once a month he submitted billings to Morse; he attended lectures and classes at Morse; and, he wore a shirt with a Morse insignia. (*Id.* at pp. 216–217.) The *Mission* court held that Blankenhorn was an independent contractor. (*Id.* at p. 213.) *Mission* explained that merely because "Morse prescribed standards of performance and that [Blankenhorn] on occasion attended lectures or classes . . . was not evidence that Morse controlled *the manner in which the desired result was to be achieved.* 'The test of "control," however, means "*complete* control." ' " (*Id.* at pp. 221-222.) Likewise here, neither the Manual, the Uniform Standard, nor the classes undermine the overwhelming evidence that RPM did not control the manner in which the desired result - transporting passengers - was achieved.

In sum, the undisputed facts here demonstrate that plaintiffs were independent contractors.

4. *Plaintiffs have not demonstrated a dispute as to any of the above-cited material facts.*

In opposing the summary judgment motions, plaintiffs attempted to dispute the overwhelming majority of facts proffered by RPM and the Joeas. Toward that end, they offered characterizations of deposition testimony or quotes from the concession agreement or the PUC license to dispute a fact unrelated to those contracts. To

13

successfully oppose summary judgment plaintiffs must present admissible evidence, " 'not merely claims or theories' " (*Trujillo v. First American Registry, Inc*. (2007) 157 Cal.App.4th 628, 635.) " '[T]he opposition to summary judgment will be deemed insufficient when it is essentially conclusionary, argumentative or based on conjecture and speculation.' [Citation.]" (*Ibid.*) Having reviewed the separate statements and documentation in support of and opposition to the summary judgment motions, we conclude plaintiffs have demonstrated no actual dispute as to any of the material facts. Accordingly, plaintiffs have failed to successfully oppose the summary judgment motions.

On appeal, although they purport to point to factual disputes, effectively plaintiffs challenge the legal conclusions the trial court drew from the undisputed facts. Plaintiffs contend that RPM controlled the details of plaintiffs' work through the dispatch procedures. They argue they did not actually have control over their own schedules because dispatch assigned fares to them. *Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1, relied on by plaintiffs is factually inapposite. In concluding that the FedEx drivers were employees, *Estrada* observed that FedEx had "control over *every exquisite detail* of the drivers' performance." (*Id*. at pp. 11-12, italics added.) In affirming the trial court's findings, the appellate court noted that the drivers' right to "control their own routes and schedules was illusive because they were 'constrained by customer pick up and delivery windows contracted by the [FedEx] sales force.' " (*Id*. at p. 9, fn. 6.) Here, by contrast, plaintiffs do not have an assigned work schedule from which they could not deviate. Only upon plaintiffs' request were they given pickup locations and times and thus "assigned" passengers. They could "skip" a day of work by requesting no scheduled fares, or arrive at any time and run loops for unscheduled passengers. After a fare, each could decide to request another fare, or could leave for the

14

day. Plaintiffs thus were not "constrained" in the same manner as the *Estrada* truck drivers.[2]

Plaintiffs also argue that many of the dispatch requirements, such as "curb coordinators," running loops, the color scheme and identification requirements for operators' vans and uniforms, and limitations on access to LAX, are evidence of RPM's control over the details of plaintiffs' work. We disagree. These are all requirements imposed on RPM by the City through the concession agreement. A putative employer does not exercise any degree of control merely by imposing requirements mandated by government regulation. (*N.L.R.B. v. Friendly Cab Co., Inc.* (9th Cir. 2008) 512 F.3d 1090, 1097, fn. 7, citing *Sida of Hawaii, Inc. v. N. L. R. B.* (1975) 512 F.2d 354, 359 (*Sida*).) In *Mission*, Blankenhorn's wearing of Morse logos, even when combined with attendance at Morse's lectures, did not yield an employer/employee relationship. (*Mission, supra*, 123 Cal.App.3d at p. 221.) The Uniform Standard also required that a driver, for example, avoid excessive jewelry and have "neatly groom[]" beards and mustaches. In *Sida*, taxi drivers were also required to satisfy personal appearance standards, but were nonetheless classified as independent contractors. (*Sida, supra,* 512 F.2d at p. 359.)

Next, plaintiffs contend that RPM exerted control through the points and lock-out systems. To the contrary. Rabanal acknowledged that "[n]othing at all" happens when points are assigned. No evidence was submitted that Diaz knew about or was ever disciplined under a "points" system. As for lock-outs, Rabanal only experienced one, and that was because he had not paid his start-up costs, not as a punishment for flouting an order from RPM. Although Diaz claimed he was locked out for attending a training

---

**2** Most of the other factors militated in favor of employment in *Estrada v. FedEx Ground Package System, Inc.*, *supra*, 154 Cal.App.4th 1, and are not present here. The instrumentalities of the work, e.g., trucks and scanners, were obtained through FedEx-approved providers and financed through FedEx. Drivers were paid weekly, many standard employee benefits were provided, and the drivers worked full time with regular schedules and routes. They worked exclusively for FedEx, and FedEx controlled the opportunities for profit. (*Id*. at p. 12.) *Estrada* is simply inapposite.

15

session to become a driver for an RPM competitor, he acknowledged the lock-out was immediately withdrawn as it was a misunderstanding on the part of a non-RPM employee. Diaz also testified he was not aware of any policies about how or whether a driver would be locked out. These systems do not evince control on the part of RPM.

Plaintiffs suggest that RPM required that a driver had to work at least 10 hours each day. However, both Diaz and Rabanal testified that they understood they could work less than 10 hours, or not at all on a given day, if they desired.

Plaintiffs next contend the trial court erred in concluding, where plaintiffs had access to airports other than LAX, that plaintiffs' relationship with RPM was not exclusive. They insist that RPM controlled who among its drivers could have access to other airports. However, it is undisputed that operators needed to apply on their own to the other airports for permits before they could enter those airport lots. Rabanal testified he could make loops at Long Beach airport and Diaz testified he could and did serve passengers at airports other than LAX.[3]

Plaintiffs argue that their subjective belief in their status is not dispositive. "[I]t is well established that a worker's belief *is* one of several secondary indicia of his or her status. [Citation.]" (*Ali v. U.S.A. Cab Ltd.*, *supra*, 176 Cal.App.4th at p. 1352, italics added.) Rabanal signed an Owner-Operator Sub-Carrier Agreement, which he understood meant *that he was not an employee*; and, in his "incident report" *reminded RPM that he was an independent contractor*. Diaz considered himself an independent contractor because he formed an LLC, Harmony's Transportation so he could personally hire drivers and generate additional income.

Finally, plaintiffs argue that the method of payment, i.e., by fare as opposed to hourly, and the lack of direct supervisors are "not dispositive" facts. Although secondary

---

[3] We are mystified by plaintiffs' arguments that they were not independent contractors because they did not have a contract with RPM, while at the same time claiming that Rabanal *did* have a contract that purports to show that he was an at-will employee. Rabanal's contract explicitly stated he was an independent contractor. In any event, the control and secondary factors, not the contract, are determinative of the relationship. (*Mark Hopkins Inc. v. Cal. Emp. etc. Com.* (1948) 86 Cal.App.2d 15, 18.)

16

factors such as the lack of direct supervisors or the manner in which plaintiffs were compensated are not *dispositive*, cumulatively they underscore plaintiffs' status as independent contractors. Even "if one or two of the individual factors might suggest an employment relationship, summary judgment is nevertheless proper when . . . all the factors weighed and considered as a whole establish that [plaintiff] was an independent contractor and not an employee." (*Arnold v. Mutual of Omaha Ins. Co*. (2011) 202 Cal.App.4th 580, 590.) Here, as analyzed, the overwhelming majority of factors establish that plaintiffs are independent contractors.

Given our conclusion that plaintiffs were independent contractors, all of their causes of action, with the exception of the eighth for fraud, fail because all are based on plaintiffs' asserted rights as employees.

5. *Plaintiffs have forfeited any challenge to the trial court's ruling on the fraud cause of action and to the portion of the judgment in favor of the Joeas*.

The trial court ruled that plaintiffs failed to dispute that no false representation was knowingly made by anyone at RPM. It also ruled that Rattan Joea was not plaintiffs' employer because he was an individual corporate agent acting as the managing member of RPM and that Parminder Joea "had no role at all" in RPM. As plaintiffs do not mention these rulings in their brief on appeal, any challenge is forfeited. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 [when appellant fails to raise a point, or fails to support a point with reasoned argument and citations to authority, it is forfeited].)

17

## DISPOSITION

The judgment is affirmed.  Each party to bear its own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:


KLEIN, P. J.


CROSKEY, J.

18